**UNITED STATES of America,**
**Appellant,**

v.

**J. Cyril JOHNSON and Ray T. Lindsay,**
**Appellees.**

**No. 16627.**

United States Court of Appeals
Ninth Circuit.

Dec. 1, 1960.

Rehearing Denied Feb. 8, 1961.

Perry W. Morton, Asst. Atty. Gen., Roger P. Marquis, Atty., Dept. of Justice, Washington, D. C., Lynn J. Gillard, U. S. Atty., San Francisco, Cal., for appellant.

Gregory A. Harrison, Atherton Phleger, Hamilton W. Budge, Brobeck, Phleger & Harrison, San Francisco, Cal., for appellees.

Before BARNES and HAMLIN, Circuit Judges, and MURRAY, District Judge.

MURRAY, District Judge.

The United States appeals from a judgment entered upon a jury's verdict fixing just compensation in a condemnation case. Taken in the condemnation action was the appellees' interest in a 505 unit housing project known as Rafael Village, constructed upon 107 acres of land adjacent to Hamilton Air Force Base in Marin County, California, together with certain personal property. Also condemned by the government were two contracts, one with North Marin County Water District under which the cost of extending water service to the project was paid by the owners of the project, and was to be recovered by the owners at the rate of 25% of the revenue collected by the Water District from water sold at the project;[1] the other was a sewage service agreement between the owners of the project and Hamilton Air Force Base for the disposal of the project's sewage through treatment facilities located on the Air Force Base.

At the time of the taking, the property was owned in fee by Rafael Village, Inc., a corporation formed by the appellees Johnson and Lindsay, subject to a note and deed of trust, which will hereafter be referred to as a mortgage. During the course of the proceedings in the court below, appellees Johnson and Lindsay were substituted as parties in place of Rafael Village, Inc., which apparently was dissolved when the project was taken

---

1. It was agreed between the parties that the value of the contract with the Water District could be tried to the court without a jury before entry of final judgment, and that was done, the Court fixing the value of that contract at $35,370.

over by the government. Since the distinction between the corporation on the one hand and the individuals on the other is of no significance for the purposes of this opinion, all will be referred to herein as appellees.

Rafael Village was constructed by appellees in the years 1950–1952. Cost of construction, or at least a very substantial part of it, was financed by a loan from Irving Trust Company, New York, which was secured by a mortgage on the housing project, and insured by the government under the provisions of the Wherry Military Housing Insurance amendment to the National Housing Act, 63 Stat. 570, 12 U.S.C.A. § 1748. The Wherry Act was passed in an attempt to relieve an acute housing shortage at military installations throughout the country. Among other things, the act made available FHA mortgage insurance on mortgages on housing projects in the vicinity of military establishments, which was otherwise unavailable under the National Housing Act. In order to obtain mortgage insurance under the Wherry Act, the Mortgagor was subject to certain regulations and restrictions. The mortgaged property had to be designed for rent for residential use by military personnel or civilian personnel attached to military bases, priority in the occupancy of the residences had to be granted to such personnel, and the rentals to be charged such residences were controlled by the Federal Housing Administration.

The original amount of the mortgage on Rafael Village was $4,050,000, and as of the date of taking by the government, December 31, 1957, the balance due on the mortgage was $3,695,755.65. The government condemned only the appellees' interest in the property, subject to the mortgage. The jury fixed $1,820,000 as the value of appellees' interest.

The government's position on this appeal is difficult to understand. It is clear the government feels the jury was overgenerous in awarding just compensation and that the judgment should be reversed, but its argument in support of a reversal is not so clear. A very substantial portion of its argument, both oral and in its brief, is completely immaterial and borders on the frivolous because it deals with problems which simply do not exist in this case.

In its argument the government devotes considerable effort to establishing the proposition that it was perfectly proper to condemn appellees' interest in the property subject to the mortgage, and that only the value of the limited interest of appellees could be here awarded. This is the theory upon which the entire trial of the case, from the opening statement of counsel to the court's charge to the jury, proceeded, so the significance of this part of the government's argument escapes the court.

In oral argument the contention was vigorously advanced by the government that not only must the legal possibility of removing restrictions placed on the property by the mortgage be shown, but that the economic feasibility of removing such restrictions by paying off the mortgage must also be shown before evidence of the value of the property without restrictions would be admissible. Whatever the merit of this contention may be, it is of no concern here because as hereinafter shown appellees' experts appraised the property in the light of all of the restrictions which existed as of the date of taking.

The government places much emphasis upon the proposition that in a condemnation case the property taken must be valued with regard to all restrictions as to use and so forth that exist at the date of taking, and that in this case appellees' interest in the property should be valued in the light of the rent controls and other restrictions that existed by virtue of the Wherry Act mortgage and mortgage insurance, which had the effect of denying to appellees as owners of the project the benefits of any inflationary influences which may have been at work. Again the government's argument may be absolutely correct, but it has no application to this appeal because appellees' experts appraised the land in exactly

the manner that the government urges it should have been appraised. Mr. Smitten, the first of appellees' experts on valuation testified:

"Q. Now, in any of your approaches or in your summation value, did you give any effect to any anticipated future increases in land value in the project? A. No.

"Q. Or any increased future rental values in the project? A. We made a rental survey of the district to discover what economic rents would be, as though this was a freehold estate.

"Q. When you say a 'freehold estate', you are referring to it being not subject to a mortgage, is that it? A. Yes, free and clear of all encumbrances.

"Q. And what did you find with respect to the economic rental levels as compared to the rental levels which you used in your income approach? A. We found that the economic rentals in the area would average, applied to this project, approximately 15% higher than the rents charged.

"Q. But you made no allowance for that in your income approach? A. No, sir."

Government counsel was aware that Mr. Smitten valued the property in the light of the restrictions as is apparent from the following statement of counsel to the Court in the course of a discussion:

"Mr. Cavalier: Well, of course, Mr. Smitten, your Honor, has testified that he has valued that value of $1,850,000, that value is based on the status quo, so to speak, as of December 31, 1957."

Appellees' only other expert appraiser testified as follows:

"Q. Now, in either your summation approach, or in your financial approach to this property, have you given any weight to any future appreciation in the land on which the project is located? A. No, sir, I

have not, and I would like to explain it for just a moment, if I may. That is one of the so-called weaknesses that unfortunately occur in our income approach. We do not have a hard, fast rule to value these, so that all we can do is to assume present-day factors. Consequently, the value that has been placed on the land in the income approach and the valuation on the summation are only the values that exist, in my opinion, as of 1957.

"Q. And without any allowance for any speculative future increases? A. No, none whatsoever, which is certainly a very realistic possibility.

"Q. And what about any possible increase in rents? A. The same thing is true there. It does not take into account any rental increases.

"Q. Does it take into consideration any predicted condition of inflation? A. None whatsoever; no, it does not."

Smitten and Clark were the only witnesses for appellees as to market value of the property on the date of taking. Neither expressed an opinion as to the market value of the property with the restrictions removed.

The government complains that it was unduly restricted in cross-examination of the appellees' expert, Mr. Smitten, as to the effect the restrictions contained in the mortgage would have on the value of the property. An examination of the record in this connection shows that when government counsel started to ask Mr. Smitten on cross-examination concerning rental restrictions on the property contained in the mortgage, objection was made and after some colloquy between the Court and counsel, the Court ruled "Oh, well, that hasn't anything to do with the fair market value of the property, but go ahead and ask your questions." At the time government counsel declined to proceed with the examination, but requested the Court to

hear argument, which the Court did in the absence of the jury. After completion of that argument, court adjourned for the day and the following morning counsel for appellees made the following statement:

"Now, whatever the law may be and whether admissible or not admissible, and whether or not it is proper cross-examination we will not object to government counsel asking our valuation witness what, if any weight or value he gave, or whether it would affect his opinion or the opinion of a buyer, when his attention is called to the mortgage or any provision of the mortgage or Articles, or sewer contract— which actually is not even in evidence yet."

However, no further attempt was made by the government to go into the subject with any of appellees' expert witnesses.

In the same category is the government's complaint of various rulings whereby the trial court excluded testimony relative to the operating expenses of Rafael Village as shown by the books and records of Rafael Village, Inc., the corporation which operated the project. Examination of the record discloses that in each instance complained of the ruling of the Court was correct in the context in which it was made. But over and above that, all of such evidence, which the government complains was excluded, was in fact admitted to the then complete satisfaction of government counsel. Thus, government counsel stated:

"Your Honor, I want to make this perfectly clear to the court. There is no ulterior purpose in referring to the books in this case and the

summary that the Court—I don't think the Court has seen Mr. Prakel's summary. The summary lists very briefly the list of expenses as set out in the 1957 statement. If I am permitted to have that summary in evidence or to have Mr. Prakel merely state what those expenses were, I am perfectly satisfied."

The summary was admitted in evidence.

█ Likewise the government devotes considerable argument to the proposition that the evidence should not have been admitted as to the reproduction cost new less depreciation approach to the valuation of the property. Not only was this evidence not objected to when given by appellees' experts, but the government's own expert gave such testimony.[2]

It is obvious that the claims of error discussed above, to which the government devoted the major portion of its brief and oral argument, attempt to raise questions which simply are not presented by the record in this case, and are without merit. The remaining assignments of error, while they do deal with questions presented by the record, are equally without merit.

The government claims it was erroneously restricted in its cross-examination of appellee Johnson. Johnson, a building contractor, was in charge of construction of Rafael Village when it was constructed, and was familiar with the amounts of material and labor involved in the construction. He was called as a witness by appellees solely to establish the cost of reproducing the project as of December 31, 1957, the date of taking. This he did by taking the quantities of material and labor which went into the

---

2. Furthermore, such evidence was not offered or received as the measure of value of the property on the date of taking but was merely one approach used by all the experts, including the one who testified for the government, in arriving at their opinions as to the value of the property and as a check on such opinions. As pointed out in United States v. 25.406 Acres of Land, 4 Cir., 172 F.2d 990, 993, certiorari denied 337 U.S. 931,

69 S.Ct. 1496, 93 L.Ed. 1738, "Testimony as to value would be worth little or nothing, if witnesses were not allowed to explain to the jury their qualifications as experts and the reasoning by which they have arrived at the expert opinion to which they testify; and the rule is that they may thus give the grounds of their opinion. Wigmore on Evidence, 2d Ed., Sec. 562; Lewis, Eminent Domain, 3rd Ed., Sec. 654."

project when it was constructed in the years 1950–1952, and applying to those quantities the 1957 unit prices. He did not testify on direct examination concerning the cost in 1950–1952 of the construction of the project, or the cost of the land, or the operation of the project, either as to costs or income. These were the subjects of the questions on cross-examination to which objections were sustained.

■ The scope and extent of cross-examination rests in the sound discretion of the trial court, and his action in that regard will not be reviewed unless there is an abuse of that discretion. Glasser v. United States, 315 U.S. 60, 83, 62 S.Ct. 457, 86 L.Ed. 680; Young Ah Chor v. Dulles, 9 Cir., 270 F.2d 338; Robinson v. United States. 9 Cir., 262 F.2d 645; Summers v. United States, 9 Cir., 250 F.2d 132; Lott v. United States, 5 Cir., 230 F.2d 915; Chevillard v. United States, 9 Cir., 155 F.2d 929.

■■ "A long established and quite strictly enforced rule in federal courts has been that cross-examination of a witness is limited to the scope of direct examination (citing cases)." Wegman v. United States, 8 Cir., 272 F.2d 31, 34; Chevillard v. United States, supra. Since all of the questions to which objection was sustained had little or no bearing on the subject matter of Johnson's direct examination, it cannot be said that there was an abuse of discretion in sustaining the objections.

: Complaint is made as to the admission of evidence as to so-called comparable sales. One of the appellees' experts in his reproduction cost of improvements, less depreciation, plus land value approach to valuation, testified that he considered sales of other undeveloped areas in the vicinity in arriving at his opinion as to the value of the land. The location of these other lands with relation to Rafael Village was illustrated by introducing in evidence maps of the area showing the location of Rafael Village and these other areas that had been sold. Likewise, in an effort to arrive at the market value of Rafael Village, the same expert attempted to determine what its value would be if the individual units were sold separately, and in this connection he considered sales of other comparable housing units in the area to form his opinion as to the value of the individual units. The government contends that in neither instance was there a sufficient showing of comparability between the subject property and the other units to warrant the admission of the evidence.

■ In the determination of the fair market value of property taken in a condemnation case, evidence of the price for which similar property has been sold in the vicinity may be admissible upon two separate theories and for two distinct purposes. First, such evidence may be admissible as substantive proof of the value of the condemned property, or secondly it may be admissible, not as direct evidence of the value of the property under consideration, but in support of, and as background for, the opinion testified to by an expert as to the value of the property taken.

"The rule is well settled in most jurisdictions that ordinarily 'the value of lands, or interests in realty, at a particular time, may be proved by evidence of voluntary sales of similar property in the vicinity made at or about the same time.' (Citing cases). And although there is some conflict in the decisions, we think the better rule is that where the opinion of an expert witness is based in part on such sales, he should be permitted to give the details of the sales upon which he bases the opinion, although the facts so stated do not become independent evidence. (Citing cases)." United States v. 5139.5 Acres of Land, etc., 4 Cir., 200 F.2d 659, 662.

See also Atlantic Coast Line R. Co. v. United States, 5 Cir., 132 F.2d 959, 963; United States v. 25.406 Acres of Land, etc., 4 Cir., 172 F.2d 990; International Paper Co. v. United States, 5 Cir., 227 F.2d 201; United States v. Lowrie, 4 Cir., 246 F.2d 472.

■ Quite obviously when evidence of the price for which similar property has been sold is offered as substantive proof of the value of the property under consideration, a foundation should be laid showing that the other property was sufficiently near that in question, and that it was sufficiently like the property in question as to character, situation, usability and improvements to make it clear that the two tracts were comparable in value. However, where evidence of sales of similar property is offered not as substantive proof of value, but merely in support of, and as background for, the opinion of an expert as to the value of the land in question, the requirement of such foundation is not so strict. As was stated by Chief Judge Parker in United States v. 5139.5 Acres of Land, etc., supra, "If the expert has made careful inquiry into the facts (of such sales), he should be permitted to give them as the basis of the opinion he has expressed. If he had not made careful inquiry, this will be developed on cross examination."

■ The evidence of the so-called comparable sales in this case was not offered as substantive proof of the value of the property taken, but only in support of the expert's opinion as to value.[3] Under the above authorities its admission was not error.

■ The government assigns as error the ruling of the trial court in excluding the testimony of a Mr. Hanford, offered by the government as an expert witness as to value. Whether a witness is qualified to express an opinion on the value of realty is a preliminary question for the trial Judge, the determination of which is within his discretion; and his decision is conclusive unless there has been an abuse of discretion or a clear error of law. Montana R. Co. v. Warren, 137 U.S. 348, 353, 11 S.Ct. 96, 34 L.Ed. 681; Love v. United States, 8 Cir., 141 F.2d 981. This rule was recognized in this circuit in Ruud v. United States, 9 Cir.,

256 F.2d 460, 461. In the opinion in that case Judge Fee stated:

"It must be remembered that an attempt had been made to qualify each of these witnesses as competent to give an opinion as to value and best use. *If the Court had gone no further than to say that neither had sufficient qualifications to testify the ruling would have been within its discretion.*"

■ In this case the Court ruled simply that Mr. Hanford was not shown to be qualified to give his opinion as to market value of the subject property. The testimony of Mr. Hanford showed he had been in the real estate business since 1922, and was primarily a manager of property, office buildings, apartment houses, industrial property and the like, mostly in and around San Francisco. He was a lecturer on the subject of real estate management and practice. He had never constructed, owned, managed or bought or sold a subdivision property. He had made some appraisals of property, again mostly office and apartment buildings, industrial property and some tracts of land for possible subdivision purposes. The only housing project he had ever appraised was in the State of Oklahoma. None of his appraisal experience or property management experience had taken place in Marin County. On this showing, perhaps some trial courts, in the exercise of their discretion, would consider the witness qualified and permit his testimony, while others would not. In any event, this court cannot say that the ruling below excluding the testimony was either an abuse of discretion or a clear error of law.

■ Likewise, the question as to whether or not the jury should have been permitted to view the property was a matter that rested in the discretion of the trial court. Justice v. United States, 9 Cir., 145 F.2d 110; Murhard Estate Co. v. Portland & Seattle Ry. Co., 9 Cir., 163 F. 194, 198. The location and composition of the Rafael Village was clear

3. See footnote 2, supra.

from the evidence; there was no conflict in the testimony as to the physical characteristics of the project or its surroundings or location which a view of the premises would aid the jury in resolving. Pictures of each of the different types of units included in the development were received in evidence. Under these circumstances there was no abuse of discretion in refusing to permit the jury to view the property.

The government asserts that the judgment is demonstrably excessive. This assertion is based on the ground that Mr. Clark, one of appellees' expert witnesses, in his reproduction cost approach to valuation did not deduct some $268,-000, representing the penalty which would have to be paid in order to free the property of the mortgage restrictions by paying off the mortgage all at once, and that, therefore, the judgment is excessive to that extent. This argument is fallacious in several aspects. In the first place, as previously pointed out, neither Mr. Clark nor any of the experts used reproduction cost as the standard of value of the property, but only as one approach to forming an opinion as to fair market value, and as a check on that opinion. In the second place, likewise as previously pointed out, the opinions of market value, testified to by both Mr. Clark and Mr. Smitten, appellees' experts, were arrived at in the light of the mortgage restrictions. Neither expressed an opinion as to the value of the property with the mortgage restrictions lifted, so there was no necessity in arriving at that opinion to consider the penalty involved in paying off the mortgage.

Both of appellees' experts testified that in their opinion the fair market value of the property on the date of taking, considered in the light of the existing restrictions imposed by the mortgage, was $1,850,000. The jury's award of $1,820,000 is supported by competent evidence and is within the range of the expert testimony, and, therefore, will not be disturbed on appeal. Simmonds v. United States, 9 Cir., 199 F.2d 305.

Finally, the contention is made that the United States was deprived of a fair and impartial trial because of the bias and prejudice of the trial Judge. This bias and prejudice is said to have manifested itself in rulings of the Court, remarks made by the Court, and in the Court's charge to the jury. The rulings restricting cross-examination, refusing to permit the witness Hanford to testify as an expert, and refusing to permit a jury view of the property have all been considered above and found to be either correct as a matter of law in the context in which made, or matters within the discretion of the Court in which there was no abuse of that discretion. The trial court did use some strong language in colloquy with counsel, but these instances occurred out of the presence and hearing of the jury, and could not have influenced the jury in its consideration of the case. Taken as a whole, the Court's charge fully and fairly presented the case to the jury. In the course of the charge the Court did misstate the import of the testimony of a government witness, but upon having the misstatement called to his attention the Court promptly corrected the statement and instructed the jury to disregard the incorrect statement.

Neither individually nor collectively do these incidents in the course of the trial furnish any basis for the charge of bias and prejudice leveled at the trial court for the first time on appeal. Apropos of the situation here is the statement of the Court in Adams Dairy Co. v. St. Louis Dairy Co., 8 Cir., 260 F.2d 46, 55:

"The zeal with which counsel for appellant present this contention on appeal contrasts sharply with their failure to demonstrate any concern at the time the challenged conduct was in progress. A painstaking and assiduous examination of the voluminous record reveals that not a single objection was made or exception taken to the conduct of the judge, said to be so prejudiced as to constitute denial of due process. Under Rule 46 of the Federal Rules

of Civil Procedure, 28 U.S.C.A., a party is required to make known his objection and grounds therefor. Substance inheres in this requirement and observance thereof is essential to the administration of the business of the courts."

The judgment is affirmed.