**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**429.59 ACRES OF LAND et al.,
Defendants-Appellees.**

No. 76–3739.

United States Court of Appeals,
Ninth Circuit.

Jan. 25, 1980.

Regina L. Sleater, Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Paul D. Engstrand, San Diego, Cal., argued, for defendants-appellees; A. E. Walkoe, C. Michael Cowett, San Diego, Cal., on brief.

Before WALLACE and FARRIS, Circuit Judges *, and LUCAS **, District Judge.

---

\* The panel originally consisted of Hufstedler and Wallace, Circuit Judges, and Lucas, District Judge. Judge Hufstedler subsequently recused herself from the panel because of her resigna-

LUCAS, District Judge:

The Government challenges the amount of compensation awarded the landowners in this condemnation proceeding (40 U.S.C. § 258a). The compensation was set by a Commission appointed by the District Court pursuant to Rule 71A(h) of the Federal Rules of Civil Procedure. The District Court approved the Commission's findings and entered judgment for the landowners in the sum of $6,915,750 together with interest. The Government argues that the Commission erred in finding that the highest and best use of the condemned property was a marina and in valuing the property for that purpose. The Government also contends that the District Court erred in instructing the Commission to value the property taken as an economic unit and in setting the rate of interest payable on the deficiency award. We affirm.

The land taken adjoins the Imperial Beach Naval Air Station along the Pacific Coast between the City of San Diego and the Mexican border. On May 19, 1971, the date of taking, the land was undeveloped tidal marshland in the Tijuana River estuary. On April 11, 1974, the District Court appointed the Commission to determine the amount of just compensation. The District Court instructed the Commission to consider "all of the uses and purposes for which [the property] is adaptable and available, including its highest and best use." The District Court also instructed the Commission that the landowners had the burden of proving that any permits or agreements necessary to develop the property as a marina "within the realm of reasonable probability [could] have been secured at the time of the date of taking, or in the reasonably near future from said date."

After hearing extensive evidence, both oral and documentary, the Commission found that "the highest and best use of the subject property on May 19, 1971, was for a public and private marina for commercial and residential purposes." The Commission

gave the following reasons for that determination: (1) "the subject property was part of an area which, for several years preceding the date of taking, had been the subject of studies, proposals, plans, zoning regulations, designs and cost estimates respecting its use as a marina;" (2) the owners of the property and others had entered into agreements to develop the property as a marina and had taken steps to obtain the permits necessary for such a development; (3) the evidence established the "adaptability, availability, desirability and economic feasibility" of using the property for a marina; and (4) appraisers and engineers testified that a marina was the highest and best use for the property.

Throughout these proceedings, the Government has argued that the landowners failed to prove that the highest and best use of the property was a marina because it was not reasonably probable that the permits and agreements necessary to construct a marina could have been obtained on or near the date of taking. It is undisputed that a series of permits and agreements would have been necessary to construct a marina, including (1) permits from the United States Army Corps of Engineers to cut an ocean entrance, dredge a tidal estuary, and deposit spoil, and (2) an agreement with the State of California, owner of the tideland areas of proposed development settling boundaries or arranging a property exchange. The Government contended that federal and state environmental legislation, together with regulations implementing those statutes, would have prevented developers from obtaining the necessary permits and agreements.

I

The Commission's findings of fact must be accepted unless they are clearly erroneous. (*United States v. Merz*, 376 U.S. 192, 198, 84 S.Ct. 639, 11 L.Ed.2d 629 (1964); Fed.R.Civ.P. 71A(h) & 53(e)(2).) Our re-

___

tion from the bench. Her place on the panel was filled by Judge Farris who was selected pursuant to the Order of November 23, 1979.

** The Honorable Malcolm M. Lucas, United States District Judge, Central District of California, sitting by designation.

view of the record convinces us that the Commission's finding that the property could have been developed as a marina cannot be disturbed on appeal. Inherent in the finding of the highest and best use is the determination that the necessary permits and boundary agreement would be obtained at the date of taking or within the foreseeable future from that date, despite any environmental concerns.

The testimony on this issue was sharply conflicting. The Commission chose to accept opinion evidence from developers and appraisers that it was reasonably probable that the necessary permits and agreements could have been obtained. The Commission refused to credit contrary testimony by government witnesses. We are not permitted to reweigh the evidence nor to reassess the credibility of the witnesses.

■ Just compensation for condemned property is measured generally by the fair and reasonable market value of the property or interest taken. Market value is the price which a reasonable seller who desires to sell but is not required to sell would demand for the property and the price which a reasonable buyer who desired to buy but was not required to buy would pay for the same, assuming a reasonable time for negotiations and explorations of alternatives. *United States v. 91.90 Acres of Land, etc.,* 586 F.2d 79, 86 (8th Cir. 1978) *cert. denied* 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979); *Cf. United States v. Miller,* 317 U.S. 369, 374, 63 S.Ct. 276, 87 L.Ed. 336 (1943). In determining market value, consideration must be given to all the facts and circumstances that would reasonably go into the making of a bargain of purchase and sale. *United States v. Smith,* 355 F.2d 807, 809 (5th Cir. 1966); *United States v. Johnson,* 285 F.2d 35, 41 (9th Cir. 1960).

■ The landowner does have the burden of establishing the value of the property subject to condemnation. *United States ex rel. TVA v. Powelson,* 319 U.S. 266, 273, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943); *United States v. Shewfelt Investment Co.,* 570 F.2d 290, 291 (9th Cir. 1977). The landowner

may prove the market value of the subject property by submitting evidence of recent sales of similarly situated property. *United States v. Johnson, supra.* He may also seek to prove the market value by submitting the testimony of expert witnesses who are qualified to appraise the value of the subject property, and who have a factual basis for forming an opinion. *United States v. 100 Acres of Land,* 468 F.2d 1261, 1268 (9th Cir. 1972), *cert. denied,* 414 U.S. 822, 94 S.Ct. 119, 38 L.Ed.2d 54 (1973); *United States v. Smith, supra; United States v. Johnson, supra.*

■ Comparable sales may be cited by the expert as a basis for his opinion on the value of the property. When sales of other property are used as a basis for expert testimony, the requirement of showing similarity between the subject property and the other sales is not as rigorous as it is when the sales of other property are offered as substantive proof of value. *United States v. Johnson, supra.* Instead, the proper inquiry is whether the expert has made careful inquiry into the facts of the other sales, and whether his opinion is founded upon such careful inquiry. In situations where there are few instances of comparable sales in recent times, the expert is only expected to make a reasonable estimate of the market value of the subject property after examining all the relevant facts. *United States v. Glanat Realty Corp.,* 276 F.2d 264, 266 (2d Cir. 1960).

Even though the reasonable and willing buyer would consider it reasonably probable that the necessary permits and agreement would be obtained on or near the date of taking, it is still possible, as the Commission recognized, that such a buyer might be affected in his valuation of the subject property because of delays caused by environmental concerns. The record shows that the landowner's expert witness, Jones, took the effect of environmental concerns into account in making his appraisal of the subject property. In particular, he stated that he was aware of the enactment of environmental legislation and regulations between 1968–71, that he had examined these, and

had examined the files of the Corps of Engineers. Reporter's Transcript [R.T.] 1654–58, 1684–89. From an assessment of these environmental laws and policies, his investigations with the governmental agencies, and general knowledge, he concluded that it might have been more difficult to obtain the necessary permits and agreements in 1971 than it would have been in 1968.

Jones made his appraisal by starting with the per acre value of the Coronado Cays development, a property which was sold three years before the date of taking and one which "had the same situation relative to obtaining boundary agreements with the State and property which involved the handling of materials on a dredging basis." R.T. 1383. He then made adjustments to that base value for increased property values in the ensuing three years; for the better location of the subject property; for the reduced holding period required with the subject property; and for the cost of the ocean cut necessary to develop the subject property.

The increase for the reduced holding period of the subject property, as compared with Coronado Cays was made because "the subject property, as of May, 1971, was well along in its acceptance of its project by the City, by the State, by the Federal Government on Corps permits and to a prospective purchaser, it is my judgment that the work that would have been completed and was completed did enhance the property as compared to one where you have to go from there on." R.T. 1857. This adjustment in the value of the property reflects the cost of any delay which might have been caused by environmental concerns. In essence, Jones testified that, despite possible delays caused by growing environmental concerns, a reasonable and willing buyer would place a premium on the subject property because of the amount of work that had already been accomplished toward acquiring the permits and agreement. The Commission, of course, adopted the appraisal of Jones and made the adjustment in value for the reduced holding period.

We find that the testimony of Jones is sufficient to affirm the decision of the Commission on just compensation. He was aware of the environmental concerns, but still concluded that the permits and agreement would be obtained. As well, he believed that any additional cost of delay was offset by the benefit of having a certain amount of work done to obtain the approval of the governmental entities. We hold that the expert is required to do no more than make the environmental concerns part of the universe of facts upon which he bases his appraisal. Here, the primary basis of the appraised value was the Coronado Cays development. The value of that sale was not offered as substantive proof of the value of the subject property, but as a datum in the calculus of the expert's opinion. Jones made appropriate adjustments to the comparable sale. His opinion of market value was founded on his assessment of all relevant factors, including the growing environmental concerns. The adoption by the Commission of Jones' evaluation of the property was not clear error.

II

Following instructions from the District Court to consider the valuation of the land as a unit and permitting the Commission to award severance damages, the Commission valued the entire tract and awarded $2,732,-895 severance damages.

■ The Government argues that the District Court erred in instructing the Commission to value the property as a unit because the property was not owned by a single entity. The District Court issued the instruction after the Court heard evidence and decided that it was "reasonably probable that the properties would be used in combination." If the District Court's factual finding was supported by the record, the instruction that it issued to the Commission was correct. As the Supreme Court stated in *United States v. Miller, supra,* 376 U.S. at 376, 63 S.Ct. at 281: "[A] parcel of land which has been used and treated as an entity shall be so considered in assessing compensation for the taking of part or all

of it." The fact that land thus treated is owned by different entities does not destroy the unity concept. (*Olson v. United States,* 292 U.S. 246, 256, 54 S.Ct. 704, 709, 78 L.Ed. 1236 (1934) ("The fact that the most profitable use of parcel can be made only in combination with other lands does not necessarily exclude that use from consideration if the possibility of combination is reasonably sufficient to affect market value.").)

The record amply supports the District Court's factual determination. The property taken by the Government had been acquired by a series of transactions organized by Dr. Theodore G. Lambron. Lambron was President, Chairman of the Board, and Chief Executive Officer of the three corporations formed for the purpose of acquiring the land. A majority of the land was held in 50–50 undivided ownership interests by Helix Land Company and Helix 1960, Inc. The same two corporations also had a 50–50 undivided ownership interest in a wholly-owned subsidiary, Helix Imperial Harbour Development Corporation. Helix Imperial owned the rest of the land either alone or in combination with its two parent corporations. The evidence was persuasive that the properties of the several corporations were to be used in combination.

■ Severance damages may be awarded when ownership of both the property taken and any contiguous remainder is held by the same entities in the same manner. (*United States v. 87.30 Acres of Land in Whitman and Garfield Counties, Washington,* 430 F.2d 1130 (9th Cir. 1970); *United States v. Honolulu Plantation Co.,* 182 F.2d 172 (9th Cir., 1950). Even if we disregard the joint ownership and management of the Helix companies and consider them as separate entities, severance damages would nevertheless be appropriate in this case. Each corporation owned fee interests in both land that was taken and land that is part of a contiguous remainder to the land acquired by the Government. Severance damages are thus appropriate under the traditional

rule; the amount of such damages is not affected by joint valuation of the properties.[1]

The calculation and amount of severance damages in this case is fully supported by the record for the reasons heretofore discussed.

### III

In computing the amount of interest to be paid by the Government on the amount of compensation awarded over and above the moneys deposited in court by the Government, the Court told the Commission that "[t]he interest to be paid defendants on any unpaid award should be at such rate as would have been received, subsequent to May 19, 1971, by a reasonably prudent person investing funds so as to produce a reasonable return while maintaining safety of principal." The Commission found that a reasonable rate of interest would be 6.635 percent compounded annually, or 7.4 percent per annum. The District Court approved the Commission's findings.

■ The Government argues that the interest rate fixed by the Commission is erroneous because it failed to take into account the risk-free nature of the Government's obligation to pay any deficiency award. Because the determination of a reasonable rate of interest is a question of fact (*United States v. Blankinship,* 543 F.2d 1272, 1274 (9th Cir. 1976)), we can disturb the Commission's finding only if it is clearly erroneous. We do not believe that the Commission's finding is clearly erroneous.

■ The payment of interest on deficiency awards in condemnation cases is designed to satisfy the constitutional standard of just compensation by putting the owner "in as good position pecuniarily as he would have occupied if his property had not been taken." (*United States v. Miller, supra,* 317 U.S. at 373, 63 S.Ct. at 279–280.) It is assumed that a person who received the pecuniary value of his property as of the

1. This case is distinguishable from *United States v. Honolulu Plantation Co., supra,* because the plaintiff sugar refinery in that case had no compensable interest in sugar cane fields taken from a third party.

date of taking would invest these funds in a reasonably prudent manner. Thus, it is proper, when payment of just compensation is delayed, to fix interest on any deficiency award at the rate "a reasonably prudent person investing funds so as to produce a reasonable return while maintaining safety of principal" would receive. The Commission properly carried out the District Court's instruction.

Because a reasonably prudent investor would diversify his risk, it is proper to consider the rate of interest paid on different types of securities with different maturities. The Commission did precisely this. The Commission considered interest rates paid on a wide range of government and private obligations with both short-term and long-term maturities. In determining the appropriate interest rate, the Commission selected a composite of four of these securities—six-month Treasury bills, four- to six-month prime commercial paper, ninety-day prime bankers acceptances, and six-month bank certificates of deposit. The Commission then averaged the interest rates paid on these composite securities throughout the period from the date of taking to the time of the Commission's report.

*United States v. Blankinship, supra,* does not require the application of any fixed formula for interest rate determinations in condemnation cases. In *Blankinship,* an interest rate determination was remanded for reconsideration because the trial court did not consider interest rates paid on government obligations with maturities greater than 180 days. The Commission considered such evidence in our case. The fact that it chose not to include such interest rates in its ultimate calculation of a reasonable rate of interest is not reversible error. Nor did the Commission err by compounding the 6.635 average rate of interest to arrive at a figure of 7.4 percent simple interest per annum. Compounding of interest is appropriate to compensate the landowners for the loss of use of the interest that the deficiency award would have been producing for them during the interim.

The judgment of the District Court is in all respects AFFIRMED.