[851 NE2d 1153, 818 NYS2d 802]

JAMES S. DENIO, as Guardian of the Person and Property of SARAH J. DENIO, Respondent-Appellant, v STATE OF NEW YORK, Appellant-Respondent.

Argued April 27, 2006; decided June 8, 2006

## POINTS OF COUNSEL

*Eliot Spitzer, Attorney General,* Albany (*Michael S. Buskus, Caitlin J. Halligan, Daniel Smirlock* and *Peter H. Schiff* of counsel), for appellant-respondent. I. Fundamental principles of economics, previously embraced by this Court, require that the "discount rate" used to determine the "present value" of awards also be used as the interest rate for the interval of time for which the awards are discounted to present value. (*Matter of Oil Spill by Amoco Cadiz Off Coast of France on Mar. 16, 1978,* 954 F2d 1279; *Jones & Laughlin Steel Corp. v Pfeifer,* 462 US 523; *Wetzler v Sisters of Charity Hosp.,* 17 AD3d 1088; *Abellard v New York City Health & Hosps. Corp.,* 264 AD2d 460; *Hollwedel v Duffy-Mott Co.,* 263 NY 95; *Milbrandt v Green Refractories Co.,* 79 NY2d 26; *Pay v State of New York,* 87 NY2d 1011.) II. Determination of a proper interest rate should be guided by short-term, risk-free Treasury rates, the maturity dates of which should approximate the interval for which interest is owed. (*Rodriguez v New York City Hous. Auth.,* 91 NY2d 76; *Brown v United States,* 615 F Supp 391, 790 F2d 199, 479 US 1058; *Greenway v Buffalo Hotel,* 951 F Supp 1039; *Jones & Laughlin Steel Corp. v Pfeifer,* 462 US 523; *Jafri v Jafri,* 176 Misc 2d 246;

*Reid v County of Nassau,* 156 Misc 2d 533; *Auer v State of New York,* 185 Misc 2d 254, 283 AD2d 122; *Matter of New York State Urban Dev. Corp. [Alphonse Hotel Corp.],* 293 AD2d 354; *Guido v State of New York,* 187 Misc 2d 647; *Pay v State of New York,* 176 Misc 2d 540.) III. In the alternative, short-term money market interest rates should be selected as a benchmark. (*Rodriguez v New York City Hous. Auth.,* 91 NY2d 76; *Matter of County of Suffolk,* 109 AD2d 155; *Matter of South Bronx Neighborhood Dev. Plan,* 110 Misc 2d 571, 89 AD2d 948, 58 NY2d 532; *Marine Midland Bank v State of New York,* 118 Misc 2d 472; *Matter of Janes,* 223 AD2d 20, 90 NY2d 41; *Binghamton Masonic Temple v City of Binghamton,* 158 Misc 2d 916; *Matter of Oil Spill by Amoco Cadiz Off Coast of France on Mar. 16, 1978,* 954 F2d 1279.) IV. Even if equity rates of return were relevant to selection of an interest rate, the State of New York met its burden here since stocks lost money and interest rates were well below 9%. (*Rodriguez v New York City Hous. Auth.,* 91 NY2d 76; *Matter of New York State Urban Dev. Corp. [Alphonse Hotel Corp.],* 293 AD2d 354.)

*Hogan & Willig, PLLC,* Amherst (*Colleen E. Buonocore* of counsel), for respondent-appellant. I. The Court of Claims erred when it apportioned 40% liability to defendant State of New York and 60% liability to Eric Poler. This finding was contrary to the weight of the evidence and to the court's own findings. The Appellate Division erred when it affirmed the apportionment. (*Noseworthy v City of New York,* 298 NY 76; *Schechter v Klanfer,* 28 NY2d 228; *Veit v State of New York,* 192 Misc 205; *Stern v State of New York,* 32 Misc 2d 357; *Barrett v State of New York,* 22 AD2d 347; *Brock v State of New York,* 58 AD2d 715.) II. The Court of Claims was correct in awarding a statutory interest rate of 9% in its discretion and the Appellate Division, Fourth Department, correctly affirmed the award. (*Standard Trust Co. v New York Cent. & Hudson Riv. R.R. Co.,* 178 NY 407; *Innis v State of New York,* 60 NY2d 654; *Gittleman v Feltman,* 191 NY 205; *Rodriguez v New York City Hous. Auth.,* 91 NY2d 76; *People ex rel. Emigrant Indus. Sav. Bank v Sexton,* 284 NY 57; *Auer v State of New York,* 283 AD2d 122; *Guido v State of New York,* 187 Misc 2d 647; *Pay v State of New York,* 176 Misc 2d 540; *Fisher v State of New York,* 292 AD2d 882; *Matter of Metropolitan Transp. Auth. v American Pen Corp.,* 94 NY2d 154.)

*Herzfeld & Rubin, P.C.,* New York City (*David B. Hamm* of counsel), for New York City Housing Authority, amicus curiae.

I. The lower courts have misapplied *Rodriguez v New York City Hous. Auth.* (91 NY2d 76 [1997]), thus undermining the legislative intent manifest in State Finance Law § 16 and Public Housing Law § 157 (5). Guidelines for the exercise of discretion under such statutes should be set by this Court. (*Abiele Contr. v New York City School Constr. Auth.*, 6 AD3d 366; *Matter of New York State Urban Dev. Corp. [Alphonse Hotel Corp.]*, 293 AD2d 354; *Guido v State of New York*, 187 Misc 2d 647, 288 AD2d 345, 97 NY2d 612; *Auer v State of New York*, 185 Misc 2d 254, 283 AD2d 122; *Regis v City of New York*, 269 AD2d 515; *Sassoonian v City of New York*, 178 Misc 2d 660, 261 AD2d 319; *Matter of Village of Port Chester*, 5 Misc 3d 1031[A], 2004 NY Slip Op 51654 [U]; *Matter of New York Urban Dev. Corp.*, 189 Misc 2d 303; *Pay v State of New York*, 176 Misc 2d 540; *Molinari v City of New York*, 176 Misc 2d 523.) II. Where, as here, a discount rate was advanced by plaintiff/claimant for calculations under CPLR article 50-B, no reason exists to permit a different rate for calculation of interest. (*Matter of Martin v C.A. Prods. Co.*, 8 NY2d 226; *Secured Equities Invs. v McFarland*, 300 AD2d 1137; *Sunseri v Macro Cellular Partners*, 263 AD2d 365; *Matter of Pace v Assessor of Town of Islip*, 252 AD2d 88; *General Elec. Co. v Inter-America Mktg. Sys.*, 220 AD2d 307, 87 NY2d 968; *Moore v County of Clinton*, 219 AD2d 131, 89 NY2d 851; *Ford Motor Credit Co. v Colonial Funding Corp.*, 215 AD2d 435; *Prudential Home Mtge. Co. v Neildan Constr. Corp.*, 209 AD2d 394; *Dennis' Natural Mini-Meals v 91 Fifth Ave. Corp.*, 209 AD2d 262; *Lanzano v City of New York*, 202 AD2d 378, 83 NY2d 760.) III. CPLR 1206 (c) provides guidance for the determination of a proper rate of interest. (*Gold v United Health Servs. Hosps.*, 95 NY2d 683; *Donato v Glicerian Gonzalo, M.D., P.C.*, 145 Misc 2d 304; *Hilgarth v Costello*, 132 Misc 2d 1020; *Matter of Livigni v Robinson*, 128 Misc 2d 345; *Rodriguez v New York City Hous. Auth.*, 91 NY2d 76; *Auer v State of New York*, 283 AD2d 122; *Guido v State of New York*, 288 AD2d 345; *Pay v State of New York*, 176 Misc 2d 540.)

*Michael A. Cardozo, Corporation Counsel*, New York City (*Stephen J. McGrath* and *Cheryl Payer* of counsel), for City of New York, amicus curiae. The appropriate rate to use in determining the interest rate on judgments against governmental entities should be that of Treasury securities of the relevant maturity. (*Rodriguez v New York City Hous. Auth.*, 91 NY2d 76; *Matter of New York Urban Dev. Corp.*, 189 Misc 2d 303; *Matter of City of New York*, 284 NY 48, *affd sub nom. A. F. & G. Realty Corp. v City of New York*, 313 US 540.)

**OPINION OF THE COURT**

GRAFFEO, J.

The issue in this personal injury case is whether the Court of Claims erred by applying a nine percent rate—the maximum rate allowed under State Finance Law § 16—for prejudgment and postjudgment interest against the State of New York. We conclude that the Court of Claims did not abuse its discretion and therefore affirm.

In 1992, Sarah J. Denio sustained serious personal injuries in a motor vehicle accident that occurred in Niagara County. Her car was struck by a vehicle driven by Eric B. Poler, who lost control of his automobile on a wet roadway. Denio suffered a traumatic brain injury, as well as multiple facial fractures, two jaw fractures, five pelvic fractures, fractures in both ankles and numerous other injuries requiring years of medical treatment and rehabilitation. Claimant James S. Denio, Sarah's father, commenced this action as her guardian against defendant State of New York, alleging that the State's negligent maintenance of State Route 31 caused Poler to lose control of his vehicle.

After a trial on liability issues, the Court of Claims in February 1999 found both the State and Poler negligent, apportioning 40% of the liability for Sarah's injuries to the State and 60% to Poler. The court determined that the State had notice of a preexisting dangerous roadway condition "in the form of three-quarter inch wheel path rutting along with inadequate superelevation/banking on the curve," and that the State's failure to take reasonable measures to correct the defect was a proximate cause of the accident. The court further concluded that Poler's negligence was "the main cause" of the collision based on his vehicle's three bald tires and expert testimony that he was speeding and did not react properly.

Following a bifurcated trial on damages, the Court of Claims awarded claimant $4,248,879.33. Before judgment was entered, the parties stipulated to CPLR article 50-B calculations, except for the rate of interest that the State owed on the award from the date of the liability determination until the entry of judgment (*see* CPLR 5002), and from the entry of judgment to the date of final payment (*see* CPLR 5003). The rate of interest to be charged against the State for prejudgment and postjudgment interest under State Finance Law § 16 was in dispute between the parties—claimant sought a rate of nine percent, while the State urged the application of a lower interest rate.

After reviewing the proof presented by the parties, the Court of Claims found claimant's position "more persuasive" and ordered the application of a nine percent rate for both prejudgment and postjudgment interest. In January 2003, the court entered a judgment reflecting the CPLR article 50-B stipulations, together with a nine percent interest rate.

The Appellate Division modified the award by increasing the damages recovery to more than $5 million, but otherwise affirmed the judgment and remitted the case to the Court of Claims for further CPLR article 50-B proceedings. During the pendency of their appeals to the Appellate Division, the parties stipulated to a partial payment of the January 2003 judgment. Upon issuance of the Appellate Division order, the parties further agreed to the form and amount of the judgment, expressly preserving their respective interest rate arguments. Judgment was entered and the State made a second payment in September 2005, thereby satisfying payment of all damages awarded to claimant, along with a prejudgment and postjudgment interest payment to the extent the State deemed appropriate. We granted the State and claimant leave to appeal.

■ The State contends that the Court of Claims erred in applying a nine percent interest rate for prejudgment and postjudgment purposes because the court improperly relied on evidence of stock market rates of return in determining a reasonable rate. Instead, the State submits that trial courts applying "ceiling" rate statutes, such as State Finance Law § 16, should calculate an interest rate based on short-term, risk-free US Treasury rates for the applicable time period covering the payment term of the judgment. Alternatively, the State suggests that trial courts should be limited to using short-term money market interest rates as the suitable benchmark but that, in no event, should equities be considered. We disagree.

A successful plaintiff in a personal injury action is entitled to interest "from the date the verdict was rendered or the report or decision was made to the date of entry of final judgment" (CPLR 5002), as well as from the entry of judgment to the date of payment (CPLR 5003).[1] The applicable rate of interest is nine percent per year "except where otherwise provided by statute" (CPLR 5004). This case involves one such exception. State

---

1. In this case, claimant was entitled to prejudgment interest from February 1999 to January 2003, and postjudgment interest from January 2003 until September 2005, when the State made its final payment.

Finance Law § 16 provides that "[t]he rate of interest to be paid by the state upon any judgment or accrued claim against the state shall not exceed nine per centum per annum."[2]

In *Rodriguez v New York City Hous. Auth.* (91 NY2d 76 [1997]), we addressed Public Housing Law § 157 (5), a comparable "shall not exceed" interest rate statute. The primary issue there was whether the nine percent interest rate was mandatory or whether Supreme Court had discretion to apply a lower rate. In resolving that question, we traced the historical underpinnings of CPLR 5004, the provision governing interest rates generally, in relation to the subject statute.

First, we noted that prior to 1972, CPLR 5004 provided that "[i]nterest shall be at the legal rate, except where otherwise prescribed by statute." At the time, the legal rate was "based upon the variable rate of interest on the loan or forbearance of money as set by the Banking Board, or, if no rate had been prescribed by the Banking Board, the rate of 6% per annum" (*Rodriguez*, 91 NY2d at 78). The Legislature amended CPLR 5004 in 1972 to replace the variable rate with a fixed interest rate of "six per centum per annum" (L 1972, ch 358).

In the years following the adoption of this amendment, interest rates increased dramatically, making it more attractive for defendants to use funds that would otherwise have been paid to plaintiffs rather than borrow monies. As a result of this development, the Advisory Committee on Civil Practice issued a report in 1981 in support of a rate increase from six percent to nine percent. The report pointed out that the use of delaying tactics permitted defendants to take advantage of the economic situation:

> "The Committee has had reported to it many examples of a party's litigation conduct apparently motivated by the low interest rate contained in CPLR 5004. When the sums involved in the case are large, it is self-evident that the longer the defendant delays the case—assuming that the plaintiff will ultimately prevail—the longer the defendant will be able to keep money at a six percent rate that he

---

**2.** A number of statutes governing the interest rate applicable to judgments against governmental entities contain similar language (*see* General Municipal Law § 3-a [counties, cities, towns and villages]; Public Authorities Law § 1212 [6] [New York City Transit Authority]; McKinney's Uncons Laws of NY § 2501 [L 1939, ch 585, as amended] [various public improvement corporations]; Public Housing Law § 157 [5] [public housing authorities]).

would have to pay two, three or even four times more for on the money market. Instances have been reported to us of patently unmeritorious appeals taken in commercial cases merely to obtain the delay, and of tort appeals, where possible in bifurcated trials, of liability findings just to postpone the trial of the damages issue" (1981 McKinney's Session Laws of NY, at 2658).

The Legislature adopted the recommendation and adjusted CPLR 5004's interest rate upward to nine percent in 1981 (*see* L 1981, ch 258).

In 1982, the Legislature decided to increase the ceiling limit for interest relating to certain governmental entities in order to parallel the CPLR 5004 nine percent interest rate enacted a year earlier (*see* L 1982, ch 681). As justification for the rate increase, the Legislature indicated that

"[t]he current rate of interest on claims paid by public owners in this state ranges from 3% for local governments, to 4% for various public corporations to 6% by the State. Since the mid-1970's the rate of interest in the private marketplace has exceeded these amounts often to a substantial degree" (Senate Introducer Mem in Support, Bill Jacket, L 1982, ch 681).

It was further recognized that the low statutory interest rates gave public entities "no incentive whatsoever to enter into reasonable negotiations" aimed at settlement (*id.*). Significantly, however, the Legislature chose to leave in place the "shall not exceed" qualifying language when it amended Public Housing Law § 157 (5), State Finance Law § 16, General Municipal Law § 3-a and Unconsolidated Laws § 2501.

Against this backdrop of legislative history, in *Rodriguez* we interpreted Public Housing Law § 157 (5) as imposing "a not-to-be-exceeded maximum, instead of a statutorily fixed, rate of interest," and determined that a trial court may, under appropriate circumstances, exercise its discretion and apply a lower rate (91 NY2d at 80). We further described the nine percent rate as "presumptively fair and reasonable" (*id.* at 81). Similar to the posture of the State on this appeal, the Housing Authority asked this Court in *Rodriguez* to limit the trial court's consideration to "relatively safe" investments such as US Treasury securities "based on the assumption that a reasonable plaintiff would have placed the verdict or judgment amount in"

such investment vehicles (*id.* at 80). We expressly declined to adopt this restriction.

Since *Rodriguez*, appellate courts addressing "shall not exceed" interest rate statutes have uniformly held that trial judges should examine "all reasonable investment possibilities during the relevant time period," including both private and public securities, in determining whether to apply a rate less than the ceiling rate (*Auer v State of New York*, 283 AD2d 122, 126 [3d Dept 2001]; *see also Abiele Contr. v New York City School Constr. Auth.*, 6 AD3d 366, 367 [2d Dept 2004]; *Matter of New York State Urban Dev. Corp. [Alphonse Hotel Corp.]*, 293 AD2d 354, 355 [1st Dept 2002]).[3] Recognizing that *Rodriguez* rejected the exclusive use of US Treasury rates as a benchmark, all four Departments have concluded that it would be illogical and unfair to focus exclusively on the lowest-returning investments in deciding whether to assign a lower interest rate.

We endorse the reasoning of these decisions. Interest is designed to compensate for the loss that results when a claimant is "deprived of the use of money to which he or she was entitled from the moment that liability was determined" (*Love v State of New York*, 78 NY2d 540, 545 [1991]). If a successful claimant was able to access a monetary award immediately, the claimant could invest those proceeds in a wide range of prudent investment choices, including money market funds, corporate bonds or reasonably-risked equity funds. Hence, it makes sense to consider a full spectrum of investments—both public and private—in determining an appropriate rate of interest. It follows that the most logical approach when attempting to persuade a trial court to apply a lower rate would be to demonstrate that an array of reasonable and balanced investment alternatives produces a return lower than nine percent.[4]

---

3. With this case, the Fourth Department has now joined the other three Departments.

4. We emphasize that the foregoing analysis applies only where a governmental entity requests that the court exercise its discretion to apply a rate lower than the ceiling rate set by State Finance Law § 16. The dissent nevertheless claims that our opinion "unsettl[es] our established condemnation jurisprudence" (dissenting op at 175). We do no such thing. In the condemnation arena, a condemnee entitled to prejudgment interest may argue that the ceiling rate is too low and consequently "would result in a denial of just compensation, or unfairness" (*Matter of Metropolitan Transp. Auth. v American Pen Corp.*, 94 NY2d 154, 158 n 1 [1999]). In that situation, a court

To rebut the presumption of reasonableness accorded State Finance Law § 16's maximum rate, the State bears the burden of proffering substantial evidence that rates of return on both public and private investments during the relevant period are below nine percent (*see generally Matter of Metropolitan Transp. Auth. v American Pen Corp.*, 94 NY2d 154, 158 n 1 [1999]; *Matter of FMC Corp. [Peroxygen Chems. Div.] v Unmack*, 92 NY2d 179, 187 [1998]). Substantial evidence " 'consists of proof within the whole record of such quality and quantity as to generate conviction in and persuade a fair and detached fact finder that, from that proof as a premise, a conclusion or ultimate fact may be extracted reasonably—probatively and logically' " (*FMC Corp.*, 92 NY2d at 188, quoting *300 Gramatan Ave. Assoc. v State Div. of Human Rights*, 45 NY2d 176, 181 [1978]). Once the presumption has been rebutted, the claimant has the burden of coming forward with evidence tending to show that a higher rate, up to the statutory maximum, is reasonable.[5]

When faced with opposing parties' interest rate evidence, a trial court must weigh the evidence to determine an appropriate rate in the exercise of its discretion. Ordinarily, in weighing the evidence, the court may find a range of reasonable rates and as long as the rate selected is supported by a rational view of the evidence, no abuse of discretion will occur. As we stated in *Rodriguez*, "[t]he fact that another interest computation may also be 'reasonable' does not mandate the selection of that rate in an exercise of discretion" (*Rodriguez*, 91 NY2d at 81). Only where the State goes so far as to establish that the ceiling rate is unreasonable would the selection of that rate amount to an abuse

---

has no discretion to apply a higher rate; rather, only where the condemnee establishes that the ceiling rate is unreasonably low in comparison to market rates will the court impose a higher rate (*see Matter of City of New York [Brookfield Refrig. Corp.—Zoloto]*, 58 NY2d 532, 537 [1983] [fixing a higher rate based on medium term public securities]). Evidence of stock market rates plays no part in this analysis because the most logical way to demonstrate that the ceiling rate is constitutionally inadequate is to present evidence that even the interest rates for the most conservative investments—such as US Treasury securities—are higher than the rate set by statute.

5. A claimant cannot simply present a portfolio of common stocks that fared particularly well during the relevant time period since hindsight surely benefits a claimant's selection of proposed investment options. A claimant must instead proffer balanced investment alternatives for the court to consider, which may include government securities, reasonably-risked corporate bond indices, money market vehicles and recognized indices for low-to-moderately-risked securities.

of discretion, because a court may not reasonably apply an unreasonable rate.[6]

In this case, the State sought the application of an interest rate lower than nine percent. Through an economist, the State advocated the use of "benchmark" rates derived from US Treasury securities, whose maturity coincided with the length of time the verdict remained unpaid. The State's expert opined that a prejudgment interest rate of 5.35% was appropriate based on the interest rate for a US government security purchased in March 1999 with a maturity date in late 2002. He further recommended a postjudgment interest rate ranging from 1.76% to 2.13% premised on US government securities with one- and two-year maturity dates. The State also submitted evidence of interest rates associated with other low-risk financial instruments, including longer term US government securities and short-term money market instruments. Relying on Federal Reserve statistics, the State's economist calculated the monthly interest rates on five such instruments: "3 Year Treasury notes, 4.97%; 10 Year Treasury bonds, 5.47%; 30 Year Treasury bonds, 5.76%; Aaa rated bonds, 7.17% and state and local bonds, 5.39%." Although maintaining that stock market performance was irrelevant, the State nonetheless presented proof indicating that stock market rates of return were also below nine percent for the relevant time period. For example, the State submitted a portfolio composed of "60% equity exposure and 40% fixed income with a portion maintained in liquid short-term investments" that would have yielded a rate of return of negative 1.93%.[7]

In opposing a lower rate, claimant argued that the State's proposed rates were too restrictive and failed to consider other safe investment vehicles historically yielding higher rates. In support of his position that the nine percent rate should be used, claimant offered a sampling of investment portfolios achieving rates of return ranging from 9.03% to 12.96%. The

---

**6.** Hence, we disagree with *Auer* to the extent it indicates that a trial court's discretion is triggered only after the defendant demonstrates, by a preponderance of the evidence, "that the statutory rate is unreasonably high" (*Auer*, 283 AD2d at 126). Rather, the court's discretion is implicated when it is presented with evidence that a rate less than nine percent would also be reasonable.

**7.** The rate was calculated using an annual return of negative 8.55% as measured by the Standard & Poor's (S & P) 500, and an annual return of 7.99% as measured by the Lehman Brothers Intermediate Government/ Corporate Index.

first portfolio proposed 75% from stock indices (allocating 25% to the S & P 500, 25% to the S & P MidCap 400 Index and 25% to the S & P SmallCap 600 Index) and 25% from a fixed income securities index (measured by the Lehman Brothers Aggregate Bond Index), yielding an annual return of 9.03% between 1999 and 2002. A second portfolio using the same investments achieved a rate of return of 12.47% from 1993 to 2002. A third portfolio allocating 75% to the S & P 500 and 25% to fixed income securities resulted in an annual return of 12.96% between 1975 and 2001. Claimant also submitted evidence demonstrating that an average of five portfolio choices achieved an annual return of 9.32% between 1951 and 2002. Finally, claimant's expert predicted that the stock market was expected to improve by late 2002.

Based on the foregoing, the State presented substantial evidence that both private and public reasonable investments could have resulted in rates of return less than nine percent during the relevant time period. The State therefore rebutted the presumption that nine percent should be applied. In response, claimant came forward with evidence to support application of the statutory maximum rate. It is clear that the Court of Claims then weighed the conflicting evidence in making its determination to apply the nine percent rate for both prejudgment and postjudgment interest.[8] The Appellate Division affirmed, although it was, of course, free to exercise its own discretion in reviewing the evidence underlying the Court of Claims' chosen rate.

When we are presented "with affirmed findings of fact, tending to show that the rate of interest was not unreasonable, and [where] these findings are supported by substantial evidence, we are jurisdictionally precluded from reviewing the same" (*City of Buffalo v Clement Co.*, 28 NY2d 241, 266 [1971]; *see also Humphrey v State of New York*, 60 NY2d 742, 743-744 [1983]). Here, claimant submitted, in relevant part, evidence that a portfolio allocating 75% to equities—as measured by three well-known stock indices—and 25% to debentures achieved a

---

8. Thus, we do not agree with the dissent's suggestion that this case be remitted to the Court of Claims to perform a weight of the evidence analysis. The Court of Claims would have had no basis for finding claimant's evidence "more persuasive" had it not been weighing the evidence in its selection of the nine percent rate in the exercise of its discretion.

rate of return of 9.03% during the relevant period.[9] The State did not directly challenge the reasonableness of claimant's investment portfolio selections. While evidence that a single portfolio supports the nine percent rate is admittedly slim and represents the outer limits of sufficiency, we are not prepared to say that such evidence was inadequate as a matter of law to uphold the Court of Claims' decision. We note that, based on the entirety of this record, either court below would have been justified in applying a lesser rate. Nevertheless, because the record supports its use of the nine percent rate, we are precluded from further review and conclude that the Court of Claims did not abuse its discretion in utilizing a rate of nine percent for prejudgment and postjudgment interest.

Finally, we note that New York's pre-1972 method of indexing an interest rate was somewhat akin to the floating interest index used by the federal courts. Since 1982, federal law requires the calculation of rates for postjudgment interest based on US Treasury securities (*see* 28 USC § 1961 [a] [computing interest "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment"]). Other states have likewise enacted statutory indexing methods to calculate various forms of interest (*see e.g.* Fla Stat Ann § 55.03; Iowa Code Ann § 668.13; Mich Comp Laws Ann § 600.6013; Minn Stat Ann § 549.09). If the New York State Legislature desires to model its interest statutes after these standards in order to reduce public expenditures or to better reflect market fluctuations in interest rates, it can certainly do so.

█ On the cross appeal, the affirmed findings of fact with respect to the apportionment of liability are supported by the record. Therefore, this matter is beyond our review (*see Scheemaker v State of New York*, 70 NY2d 985, 986 [1988]; *Humphrey*, 60 NY2d at 743-744).

We have considered the parties' remaining arguments and find them to be without merit.

Accordingly, the judgment of the Court of Claims appealed from and the order of the Appellate Division brought up for review should be affirmed, without costs.

---

**9.** On the other hand, claimant's other portfolios covering various time periods ranging back to the 1950's are not relevant to the calculation of prejudgment and postjudgment interest commencing in 1999.

READ and R.S. SMITH, JJ. (dissenting in part). The majority's opinion is wrong in several ways. First, it is wrong because it confuses two different things—a reasonable rate of interest and a reasonable return on investment. Under the statute, claimant is entitled to the former, subject to a 9% limitation. The majority reads it as though she were entitled to the latter, subject to the same limitation. The majority's misreading of the statute to authorize awards based on stock market rates of return leads into complexities and contradictions that, we fear, will in practice be resolved by awarding the 9% maximum in every case—a result contrary to the plain intention of the Legislature, as the Court held in *Rodriguez v New York City Hous. Auth.* (91 NY2d 76 [1997]).

Secondly, the majority's injection of equity rates of return into interest calculations has disturbing implications for the law of condemnation—an area in which, as the Constitution requires, interest rates are determined without a strict 9% maximum. If the logic of the majority opinion is applied in condemnation cases, condemnees may seek enormous interest rates when the stock market is booming, and condemnors may seek to use the majority opinion in reverse, with unpredictable results.

Finally, the majority opinion is wrong on its own terms. Even if it is correct to use equity rates of return as part of an interest calculation, the record here does not justify the decisions of the courts below, which the majority affirms. The Court should, at a minimum, remit this case to the Court of Claims for determination of a "reasonable" interest rate.

## I

State Finance Law § 16 provides: "The rate of interest to be paid by the state upon any judgment or accrued claim against the state shall not exceed nine per centum per annum." *Rodriguez* makes clear that under this statute, the trial court is to fix a "fair and reasonable" rate, equal to or lower than 9%, in the exercise of its discretion (91 NY2d at 80). We said in *Rodriguez* that, since 9% is the rate generally applied in cases between private parties (CPLR 5004), that rate is "presumptively fair and reasonable" (91 NY2d at 81), but that does not mean that 9% may be awarded in every case. The presumption is rebuttable.

What the statute provides for is a "rate of interest." In deciding what rate is reasonable it is important to remember what

"interest" is: "a charge for borrowed money" (Merriam-Webster's Collegiate Dictionary 610 [10th ed 1993]). In cases like this the State has, in effect, borrowed a claimant's money for a period of time ending with the date the judgment is paid. Thus the question a court should ask is: "What is a fair and reasonable rate of interest for a loan of this amount by this claimant to the State over this period of time?" Here, there is no way that the answer to that question can be 9%.

Claimant's involuntary loan, an obligation of the State, was virtually risk free. The interest rate on three-year Treasury bonds—risk-free instruments comparable in duration to the loan at issue here—was roughly 5% or 6% throughout the time in question. We do not imply that the interest rate in a case like this must always be identical to the rate on corresponding Treasury obligations. But it is clear here that the State's proposed prejudgment interest rate of 5.35% was within the range of reasonable choices, and that 9% was not.

Claimant's argument for the 9% rate, which the majority accepts, is essentially that she was entitled to more than interest on her money. She did not, she points out, choose to make a loan to the State; if she had had the money she might have invested part or all of it in the stock market, and earned a better return. The short answer is that the Legislature has not said she is entitled to the return on investment she might have earned elsewhere; it has said she is entitled to "interest." No court outside New York, as far as we know, has ever held that "interest" may be calculated on the basis of stock market returns.

The majority seems to have accepted, as did the courts below, claimant's argument that it is unfair to limit her to a reasonable interest rate on a risk-free loan. Of course, courts are not free to revise the Legislature's enactments to achieve greater fairness (*Matter of Bello v Roswell Park Cancer Inst.*, 5 NY3d 170, 173 [2005]). But apart from that, the majority's quest for a truly "fair" rate of return cannot succeed. No one can know what rate of return claimant would have earned if she had had the money to invest as she chose, because no one can know whether she would have been wise or unwise, lucky or unlucky. Implicit in the majority's decision is that this problem may be solved by assuming claimant to be a typical prudent investor, but that assumption has its own problems, because there are times—and the 1999-2002 period considered in this case was one such time—when, because the stock market is in decline,

most prudent investors will do worse than those who lend out their money at a risk-free rate. The record in this case shows that even a relatively conservative investor, who put only 60% of her money into equities that tracked the Standard & Poor's 500, would have suffered a net loss of around 2% annually (*see* infra at 178-179).

Thus the approach of assuming the claimant to be a typical prudent investor can lead, in this and in some other cases, to awarding less than a risk-free rate; in strict logic, it could lead to awarding no interest, and even to awarding less than 100% of the principal. These results are obviously unacceptable, and it is probably for that reason that the Appellate Division in *Auer v State of New York* (283 AD2d 122 [3d Dept 2001]) adopted a "heads I win, tails you lose" variation on the "prudent investor" approach. *Auer* holds, in substance, that a 9% rate of return will be held "reasonable" unless the evidence shows that *no* prudent investor could possibly have hit that target: "[T]he defendant must show that *all* reasonable investment possibilities during the relevant time period demonstrate that the [9%] statutory rate is unreasonably high . . ." (*id.* at 126 [emphasis added]; *accord, Matter of New York State Urban Dev. Corp. [Alphonse Hotel Corp.]*, 293 AD2d 354, 355 [1st Dept 2002]). This will probably never happen; there will always be some "reasonable" portfolio, chosen with the benefit of hindsight, that can produce a 9% return. The evidence in this case, which we analyze in detail below (infra at 178-179), illustrates the point: in a low interest rate environment, with the stock market going steeply down, claimant came up with a "reasonable" combination of investments that yielded, miraculously, 9.03%.

The *Auer* approach is unfair to the State, and it completely frustrates the direction of the Legislature, confirmed by our holding in *Rodriguez*, that a rate below 9% is sometimes appropriate. The Appellate Division relied on *Auer* in this case. The majority affirms the Appellate Division's order and says that it "endorse[s]" the reasoning of *Auer* (majority op at 167), but it seems to reject, in a footnote, *Auer*'s key element—its virtually irrebuttable presumption in favor of 9% (majority op at 169 n 6).

The majority's approach, as we understand it, is that the trial court is free to pick any "reasonable" rate of return. It does not say how the court is to choose, nor whether there is any floor; may the court choose a return below the risk-free rate, or even a negative return, if that is "reasonable"? Nor does the major-

ity explain how it can affirm the decision below, while rejecting its fundamental premise. As we show below, the majority is affirming a decision that the courts below did not make.

The likely practical effect of the majority's decision, despite its disclaimer, will be to drive all decisions into the 9% safe harbor that *Auer* created. It would be better, we think, to follow the statute, and *Rodriguez*, by requiring courts to award a reasonable "rate of interest."

## II

The majority decision also has the untoward side effect of unsettling our established condemnation jurisprudence. Before today, this Court required a condemnee challenging the fairness and reasonableness of the presumptively reasonable statutory rate to do so by comparing it to *prevailing market rates of interest (see e.g. Matter of City of New York [Brookfield Refrig. Corp.—Zoloto]*, 58 NY2d 532, 536-537 [1983]; *Matter of County of Nassau [Eveandra Enters.]*, 42 NY2d 849 [1977]; *Adventurers Whitestone Corp. v City of New York*, 65 NY2d 83 [1985]). The Court never considered rates of return on "reasonably-risked equity funds" (majority op at 167) to be relevant. Indeed, the idea of doing so is sufficiently fanciful that the California Supreme Court dismissed it in a footnote 21 years ago *(see Redevelopment Agency v Gilmore*, 38 Cal 3d 790, 806 n 17, 700 P2d 794, 806 n 17 [1985] ["(S)ince interest is at issue, only the rates of return on interest-bearing obligations are relevant. No case has suggested that the Constitution contemplates a 'prudent investor' in stocks or other equity securities"], citing *City of New York; see also Liberty Sq. Dev. Trust v City of Worcester*, 441 Mass 605, 808 NE2d 245 [2004] [holding that an adequate rate of prejudgment interest for a taking reflects what a prudent investor would earn in the usual interest markets], citing *Redevelopment Agency* and *City of New York*).

But now the majority has held that the rate of return on reasonably-risked equity funds, selected in hindsight, is indeed relevant to the judicial determination of fair and reasonable prejudgment interest in New York. The implications and consequences of this for condemnees and condemnors are unclear.

Can a condemnee now rebut the presumption that 9% is reasonable by presenting hypothetical portfolios of stocks and bonds with a rate of return in excess of 9% for the period of delay between the taking and payment? This would be an easy hurdle to clear when the period of delay coincides generally

with a strong bull market, as was the case in the late 1990's. Of course, as the evidence in this case, which we analyze below, demonstrates, a hypothetical portfolio of stocks and bonds may be crafted to exhibit almost any rate of return, regardless of general market conditions, so long as a major part of the portfolio may be allocated to any combination of well-recognized indices (of which there are many) after their performance is already known. Or would the condemnee have to show that prevailing market rates also significantly exceeded 9%? Suppose there is a return to double-digit interest rates—the feature of the economic landscape in the late 1970's and early 1980's which prompted the Legislature to raise the ceiling rate from 6% to 9% (*see* majority op at 165-166). In that event, may a trial judge in his discretion still award interest to the condemnee at the rate of 9% so long as the condemnor presents a single hypothetical portfolio of stocks and bonds returning 9% or less? The majority seems to say that equity rates of return are still not relevant to the question of the fairness of the statutory rate in a condemnation case (*see* majority op at 168 n 4 ["Evidence of stock market rates plays no part in this analysis"]). But a condemnee is entitled to prejudgment interest as part of constitutionally required just compensation. By contrast, a tort claimant obtains prejudgment interest only as a matter of legislative grace. Why, then, is it the tort claimant and not the condemnee who gets the benefit of stock returns? Does this pass constitutional muster?

### III

The majority concludes that the State has rebutted the statutory presumption, but then opines that "[i]t is clear that the Court of Claims then weighed the conflicting evidence [presented by the State and claimant] in making its determination to apply the nine percent rate for both prejudgment and postjudgment interest"; and that this determination is beyond review in this Court because it is supported by affirmed findings of fact (majority op at 170). The record supporting these affirmed findings—which the majority concedes dwells at "the outer limits of sufficiency"—consists of a single hypothetical portfolio, allocated 75% to equities and 25% to bonds, which exhibited an annual average rate of return of 9.03% during the relevant time period (majority op at 171). In fact, however, there is no basis for the majority to conclude that the trial judge ever weighed the parties' conflicting evidence, much less made findings of fact related to the conflicting evidence.

The relevant part of the trial judge's opinion reads in its entirety as follows:

> "The court has *reviewed all of the arguments* presented by both claimant and defendant and their experts on the pre-judgment and post-judgment interest rate issue, and *finds the position of the claimant more persuasive.* The court does not believe the defendant has overcome the presumption of reasonableness and fairness attributed to the statutory interest rate of 9%. Consequently, the court finds the rate of interest payable will be 9% for the period from the date of the liability decision to the date of entry of final judgment herein, and 9% for the period from the date of entry of final judgment to the date of payment or delivery of the annuity contract, whichever is appropriate" (emphasis added).

While the majority states that "[i]t is clear that the Court of Claims . . . weighed the conflicting *evidence*" (majority op at 170 [emphasis added]) and "[a]fter reviewing the *proof* presented by the parties, the Court of Claims found claimant's position 'more persuasive' and ordered the application of a nine percent rate" (majority op at 164 [emphasis added]), the trial judge did not mention weighing "evidence" or reviewing "proof." Instead, he stated that after reviewing the parties' *arguments*—hardly the same thing as proof or evidence—he found the claimant's *position*—again, not proof or evidence—"more persuasive."

Secondly, the trial judge erroneously decided that the State had not "overcome the presumption of reasonableness and fairness attributed to the statutory interest rate of 9%." After concluding (albeit incorrectly) that the State had not rebutted the presumption and "[c]onsequently" awarding claimant interest at 9%, the judge had no reason to weigh the parties' conflicting evidence, and the majority has no basis for assuming that he nonetheless took this unnecessary step. Certainly, there is no indication on the face of the judge's opinion that he did so. There are no findings of fact stated in his opinion, or discussions of the proof, which in and of itself constitutes reversible error by forestalling meaningful appellate review. The absence of any explanation (assuming the trial judge, in fact, weighed the parties' conflicting evidence) is particularly worrisome in this case because claimant's proof is, as the majority charitably labels it, "admittedly slim" (majority op at 171).

Specifically, of the three hypothetical portfolios that claimant presented, each of which allocated 75% to equities and 25% to bonds, only one covered the relevant time period, as the majority acknowledges. If the trial judge relied on either of the two irrelevant portfolios to find in claimant's favor, he abused his discretion as a matter of law. There is no way to know what proof of claimant's the judge may have considered—again assuming that he weighed the parties' conflicting evidence in the first place—because his opinion is silent on the point. Further, claimant's portfolio evidence was, in fact, disputed; the majority is just wrong when it states that "[t]he State did not directly challenge the reasonableness of claimant's investment portfolio selections" (majority op at 171).

The three hypothetical portfolios were attachments to claimant's attorney's affidavit. He stated that he secured them from UBS/PaineWebber and that each was "tied to well known market indices" for various time periods. There is no explanation or justification in the record as to why UBS/PaineWebber allocated 75% of each of these three hypothetical portfolios to equities and 25% to bonds. Claimant's attorney submitted only a chart captioned "Performance Results Based on Various Portfolio Asset Allocations." There is no indication who prepared this chart, which identifies a 75% equity/25% fixed income portfolio as a "growth" portfolio, not a "balanced" portfolio. The majority, by contrast, says that a claimant "must . . . proffer *balanced* investment alternatives . . . , which may include government securities, reasonably-risked corporate bond indices, money market vehicles and recognized indices for *low-to-moderately-risked* securities" (majority op at 168 n 5 [emphasis added]).

Next, the State submitted its expert's affidavit. Although the State's expert opined that returns on equities were not a proper benchmark for setting a prejudgment interest rate, he nonetheless looked at the rate of return that a hypothetical "prudent investor" would have received over the relevant time period, assuming 60% invested in equities (measured by the S & P 500) and 40% invested in fixed income securities with a portion maintained in liquid short-term investments (measured by the Lehman Brothers Intermediate Government/Corporate Index). The rate of return was a negative 1.93%.

In reply, claimant finally presented the affidavit of *her* expert, who likewise "recommend[ed] the 60%/40% balanced investment approach [which] represents a prudent investment"; and

conceded that the State's expert "is correct that if a 60% S&P and 40% LBIN is used[,] the rate of return for the pre-judgment period in *Denio* would be -1.93%." He squared this uncomfortable fact with his opinion that the statutory rate of 9% was nonetheless "appropriate" by observing that, based on historical patterns, the market was likely to rebound and perform better over the long term. But the expert's prediction about the long-term future is not relevant to the proper rates of prejudgment and postjudgment interest in this case (*see* majority op at 171 n 9).

In short, the State disputed both claimant's investment portfolio choices and her unexplained 75%/25% allocation formula. Critically, claimant's expert opined that a prudent investor would have invested 60% in equities and 40% in bonds, yet claimant presented no evidence showing what such an investment would have returned over the relevant time period; the only competent evidence in the record for such a hypothetical portfolio, which was provided by the State's expert, concededly showed a negative return. As a result, we would hold that, as a matter of law, the State has established by a preponderance of the evidence that the 9% statutory rate of interest is unreasonably high for the time period at issue, and would remit this matter for the Court of Claims to set an interest rate below 9% within the range of the State's proof. Even if the majority is not willing to go so far, it should—having held that the State rebutted the presumption that the 9% statutory rate of interest is fair and reasonable in this case—remit to the Court of Claims for it to weigh the parties' conflicting evidence, exercise its discretion, and award interest accordingly.

In sum, the majority decision suffers from a confusion—apparently unique to New York's state courts—between interest and equity rates of return. This confusion has cost the taxpayers an additional $1 million in this case alone, and threatens to disrupt the State's condemnation jurisprudence. Even assuming that equity rates of return are relevant, the majority has taken the astonishing position that the Court has no choice but to affirm here because the trial judge must have made certain findings of fact that he had no reason to believe he needed to make, and does not say he made. And the only possible record support for these supposed findings of fact—a single hypothetical portfolio allocating 75% to equities and 25% to bonds and yielding 9.03%—was not endorsed by claimant's own expert, who instead "recommend[ed] the 60%/40% balanced investment ap-

proach.'' But the only hypothetical 60%/40% portfolio in the record showed a loss for the relevant time period. We respectfully dissent.

Chief Judge KAYE and Judges G.B. SMITH, CIPARICK and ROSENBLATT concur with Judge GRAFFEO; Judges READ and R.S. SMITH dissent in part in a separate opinion.

Judgment appealed from and order of the Appellate Division brought up for review affirmed, without costs.